IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

TERRY CICIO,

                              Plaintiff,

                                                Civ. Action No.
          v.                                    9:08-CV-431 (GLS/DEP)

R. LAMORA, R. SCOTT, R. MacWILLIAMS,
K. CROSSETT, E. FACTEAU, C.O. DEMERS,
R. WOODS, R. GILL,

                              Defendants.

_____

APPEARANCES:                            OF COUNSEL:

FOR PLAINTIFF:

TERRY CICIO, *Pro Se*
01-R-5455
Upstate Correctional Facility
P.O. Box 2001
Malone, NY  12953

FOR DEFENDANTS:

HON. ANDREW M. CUOMO                    C. HARRIS DAGUE, ESQ.
Office of the Attorney General          ASST. ATTORNEY GENERAL
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Terry Cicio, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights.  In his

complaint Cicio, who refused multiple orders from prison officials to exit his

cell in order to effectuate a transfer to another location, complains that in

the course of the ensuing cell extraction, during which he was removed

through the use of force, one of the corrections officers who participated

exerted excessive force causing him to suffer injuries, while the others

involved failed to intervene, all in violation of the Eighth Amendment's

protection against cruel and unusual punishment.  As relief for the

violation, plaintiff seeks the recovery of compensatory and punitive

damages from defendants.

Currently pending before the court is defendants' motion for summary

judgment seeking dismissal of plaintiff's complaint.  In their motion

defendants challenge the legal sufficiency of plaintiff's excessive force and

failure to intervene claims and additionally assert their entitlement to

Eleventh Amendment immunity from suit in their official capacities and

good faith qualified immunity from suit as individuals.  Because a

2

reasonable factfinder could conclude from the record now before the court that more force than necessary to subdue and remove Cicio from his cell was applied maliciously and sadistically by prison officials, I am constrained to recommend that defendants' motion be denied, except as to plaintiff's claims against defendant Woods and those against defendants in their official capacities, which are subject to dismissal.

I.    BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS").    *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35-16) ¶ 3 and Exh. A (Dkt. No. 35-17).  At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[2]  *Id.*

---

[1]    In light of the procedural posture of this case, the following recitation is from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft,* 336 128, 137 (2d Cir. 2003).  It should be noted that while most of the pertinent facts are undisputed, defendants sharply contest plaintiff's allegation that he was unnecessarily punched by defendant MacWilliams during the forcible removal from his cell.

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave.  Dague Decl. (Dkt. No. 35-16) Exh. B (Dkt. No. 35-18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29-30; Gill Aff. (Dkt. No. 35-4) ¶ 5 and Exh. A (Dkt. No. 35-5).  According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area.  Cicio Dep. Tr. at pp. 27-28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates.  *See* Dague Decl. (Dkt. No. 35-16) ¶ 8.  Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges.  *Id.*; *see also* Cicio Dep. Tr. at p. 27.  At the time of plaintiff's refusal of surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

On December 27, 2007, following the razor incident, plaintiff was

4

informed that he would be relocated to a PIMS level one cell.  Cicio Dep.

Tr. at p. 31; Gill Aff. (Dkt. No. 35-4) ¶ 7 and Exh. B (Dkt. No. 35-6).  To

effectuate the move, prison officials instructed the plaintiff to place his back

to the cell door and his hands through the feed up slot in order to permit

the application of hand restraints.  Gill Aff. (Dkt. No. 35-4) ¶ 8.  Plaintiff

refused that order as well as several subsequent directives to voluntarily

exit his cell.  *Id.* at ¶ 9 and Exh. A.  Attempts were made to convince

plaintiff to reconsider his refusal; those efforts included interventions by

clergy and guidance staff at the facility.  *Id.*  When those measures proved

unsuccessful, orders were given to prepare a cell extraction team.  Gill Aff.

(Dkt. No. 35-4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora

issued a final order directing plaintiff to exit his cell, warning that if he

persisted in his refusal force would be applied to carry out his removal.  Gill

Aff. (Dkt. No. 35-4) ¶¶ 11-12; Lamora Aff. (Dkt. No. 35-8) ¶¶ 8-10; *see also*

Complaint (Dkt. No. 1) Statement of Facts ¶ 4.  Despite that last directive,

plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt.

No. 35-8) ¶ 9.

Following established facility protocol, prison officials took the first

step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance.  Gill Aff. (Dkt. No. 35-4) ¶¶ 12-13 and Exhs. A (Dkt. No. 34-5) and B (Dkt. No. 34-6); Lamora Aff. (Dkt. No. 35-8) ¶ 11.  The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose.  Gill Aff. (Dkt. No. 35-4) ¶¶ 12-14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell.  Gill Aff. (Dkt. No. 35-4) ¶ 17 and Exhs. A (Dkt. No. 35-5) and B (Dkt. No. 35-6); Lamora Aff. (Dkt. No. 35-8) ¶ 15.  To accomplish the forced extraction each of those individuals was assigned a specific task.  Lamora Aff. (Dkt. No. 35-8) ¶ 16.  Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs.  *Id*.  Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and

application of handcuffs.  *Id.*  Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints.  *Id.*  The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less.  Gill Aff. (Dkt. No. 35-4) ¶ 20; Lamora Aff. (Dkt. No. 35-8) ¶ 18; Scott Aff. (Dkt. No. 35-7) ¶ 13; Demers Aff. (Dkt. No. 35-12) ¶ 13; Crossett Aff. (Dkt. No. 35-10) ¶ 13; Facteau Aff. (Dkt. No. 35-11) ¶ 12.

Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera.  Facteau Aff. (Dkt. No. 35-11) ¶¶ 5-6.  Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded.  *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated.  Gill Aff. (Dkt. No. 35-4) Exh. A (Dkt. No. 35-5).  Plaintiff

7

was thereafter brought to a holding cell to be medically examined and photographed.  *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries.  Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder.  Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48-52.  A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest.  Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder.  No life threatening injuries.  No blood present.  Alert and oriented.  No signs of distress.  No treatment necessary.

Gill Aff. (Dkt. No. 35-4) Exh. B (Dkt. No. 35-6).  Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment.  *Id.*; *see also* Cicio Dep. Tr. at pp. 75-76.  During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries.  Gill Aff. (Dkt. No. 35-4) Exh. A (Dkt. No. 35-

5).

For the most part, the foregoing facts are not disputed by the plaintiff.

He does, however, contend that during the course of the extraction he was

"repeatedly punched" by Corrections Officer MacWiliams, who asked "you

want to play?"  Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep.

Tr. at pp. 46-47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12.  Plaintiff further alleges

that while the other members of the cell extraction team, including

Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the

abuse" he suffered, they stood by without intervening.  *Id.* at ¶ 11.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on May 7, 2008.  Dkt. No. 1.  Named

as defendants in Cicio's complaint are Robert Woods, the superintendent

at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant

Robert Gill; and Corrections Officers Richard Scott, Richard MacWillams,

Kirk Crossett, Eric Facteau, and Christopher Demers.  Plaintiff's complaint

asserts a single cause of action, alleging violation of his Eighth

Amendment right against cruel and unusual punishment.

Following joinder of issue and completion of pretrial discovery,

defendants moved on August 6, 2009 for summary judgment dismissing

plaintiff's complaint.  Dkt. No. 35.  In their motion, defendants argue that

plaintiff's excessive force and failure to intervene claims are lacking in

merit, that his claims against the defendants in their official capacities are

barred by the Eleventh Amendment, and that in any event they are entitled

to qualified immunity from suit against them for damages as individuals.

*Id.*  Plaintiff has since responded in opposition defendants' motion,[3] Dkt.

No. 36, which is now ripe for determination and has been referred to me for

the issuance of a report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B) and Northern District of New York 72.3(c).  *See* Fed. R. Civ.

P. 72(b).

III.    DISCUSSION

        A.    Summary Judgment Standard

        Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

---

[3]    Plaintiff opposes defendants' motion and, alternatively, requests that he be
granted a continuance so that he may pursue additional discovery.  In particular,
plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to
view the DOCS directives regarding use of force, video procedures, chemical
agents, and cell extractions.  As an initial matter, I note that the deadline for
completion of discovery expired on March 13, 2009, Dkt. No. 28, several months
before defendants filed their pending motion, and plaintiff has shown no reason
why he did not timely pursue the discovery now requested.  In any event, as will be
seen, none of the information now sought by plaintiff would impact my
recommendation regarding the defendants' motion, especially considering that
nearly all of the material facts are undisputed by the plaintiff.

warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R.

Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477

U.S. at 250, 106 S.Ct. at 2511.  Though *pro se* plaintiffs are entitled to

special latitude when defending against summary judgment motions, they

must establish more than mere "metaphysical doubt as to the material

facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168

F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider

whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.

Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).[4]  The entry of summary

---

[4]   With their motion defendants properly filed a statement of materials facts
alleged not to be in dispute, as required under Northern District of New York Local
Rule 7.1(a)(3). Dkt. No. 35-2.  Under that rule when filing papers in opposition to
defendants' motion plaintiff was required to submit a response mirroring
defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of
the assertions contained within it in matching numbered paragraphs.  N.D.N.Y.L.R.
7.1(a)(3).  In light of plaintiff's failure to provide such a statement, the court could
deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement,
including to the effect that defendant MacWilliams did not punch him as alleged,
*see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35-2) ¶¶ 34-35, to have
been admitted by him.  *Id.; see, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-611,
2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also
Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)

judgment is warranted only in the event of a finding that no reasonable trier

of fact could rule in favor of the non-moving party. *See Building Trades

Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

    B.   <u>Excessive Force</u>

      Plaintiff's complaint asserts a cause of action brought under the

Eighth Amendment, which proscribes punishments that involve the

"unnecessary and wanton infliction of pain" and are incompatible with "the

evolving standards of decency that mark the progress of a maturing

society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291

(1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076,

1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does

not mandate comfortable prisons, neither does it tolerate inhumane

treatment of those in confinement; thus, the conditions of an inmate's

---

(discussing district courts' discretion to adopt local rules like 7.1(a)(3)).   In
deference to his *pro se* status, and given that he has actively opposed defendants'
motion and contested the claim that defendant MacWilliams did not strike him,
though without minimizing the importance of Local Rule 7.1(a)(3), I recommend
against deeming plaintiff to have admitted the facts set forth in defendants'
statement.

confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).  The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999

14

and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was

recently emphasized by the United States Supreme Court in *Wilkins v.*

*Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not

upon the extent of the injury sustained, but instead whether the nature of

the force applied was nontrivial.  __ S. Ct. __, 2010 WL 596513, at *3 (Feb.

22, 2010) (per curiam).  Accordingly, when considering the subjective

element of the governing Eighth Amendment test a court must be mindful

that the absence of serious injury, though relevant, does not necessarily

negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically
> use force to cause harm, contemporary standards
> of decency always are violated . . . . This is true
> whether or not significant injury is evident.
> Otherwise, the Eighth Amendment would permit any
> physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v.*

*O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting

*Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140

F. Supp.2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de minimis* use of

physical force can constitute cruel and unusual punishment if it is

"repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10, 112

15

S.Ct. 1000 (citations omitted).

    With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency."  *Wright*, 554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000) (internal quotations omitted)).  When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff.  While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999.  The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force.  *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson*, 481 F.2d at 1033).  "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated . . . .  This is true whether or not significant injury is evident.'"  *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9, 112 S Ct. at 1000).

16

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Griffen*, 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993)); *see also Johnson*, 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").  Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate.  *Wrigh*t, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the

17

evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants.  Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction.  Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52-55; Cicio Aff. (Dkt. No. 36) ¶ 10.  According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor.  Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him.  *Id.*  Instead, plaintiff claims, "[MacWilliams] just kept hitting me.  He hit me several times. . . . When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me.  That means he's doing it for his own purpose. . . ."  *Id.* at pp. 52, 53-54.  One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during

18

the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio.  MacWilliams Aff. (Dkt. No. 35-9) ¶ 13.  Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him.  Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35-4) Exh. B (Dkt. No. 35-6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints.[5]   Moreover, during his deposition, plaintiff

---

[5]    Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end.  *See* Cicio Dep. Tr. at p. 37.  This evidence could provide some support for a finding that defendants' acted reasonably.

acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction.  Cicio Dep. Tr. at 80-81.

Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges.  Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact.  *Griffin*, 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him.").  I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

C.   Failure To Intervene

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants observed the incident but stood by without intervening on his behalf.[6]  Defendants

---

[6]   Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary.  *See* Woods Decl. (Dkt. No. 35-13) ¶ 7.  Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the

contend that plaintiff's failure to intervene claim similarly lacks merit.

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use

---

independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

[7]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.  *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider*, 522 F. Supp.2d 544, 555 (S.D.N.Y. 2007).  Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene.  *See, e.g., Schultz v. Amick*, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia*, *Daniels v. Williams*, 474 U.S. 327, 335-36, 106 S.Ct. 662, 667 (1986)).

Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue.  As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]."  Cicio Dep. Tr. at p. 52.  Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

D.     Eleventh Amendment

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978).  This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.  *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.  *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

It is unclear from plaintiff's complaint whether he has sued

23

defendants in their individual or official capacities, or both.  Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception.  *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).  I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

      E.    <u>Qualified Immunity</u>

      In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

      Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted).  "In assessing an officer's eligibility for the shield, 'the appropriate question is

24

the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson*, 555 U.S. at ___, 129 S.Ct. at 816.  The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 n.9

---

[8]    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

(citing *Saucier*).[9]  Expressly recognizing that the purpose of the qualified

immunity doctrine is to ensure that insubstantial claims are resolved prior

to discovery, the Supreme Court recently retreated from the prior *Saucier*

two-step mandate, concluding in *Pearson* that because "[t]he judges of the

district courts and courts of appeals are in the best position to determine

the order of decisionmaking [that] will best facilitate the fair and efficient

disposition of each case", those decision makers "should be permitted to

exercise their sound discretion in deciding which of the . . .  prongs of the

qualified immunity analysis should be addressed first in light of the

circumstances of the particular case at hand."[10]  *Pearson*, 555 U.S. at  ___,

129 S.Ct. at 818, 821.  In other words, as recently emphasized by the

Second Circuit, the courts "are no longer *required* to make a 'threshold

inquiry' as to the violation of a constitutional right in a qualified immunity

---

[9]    In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation omitted).

[10]    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, ___ U.S. at ___, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

context, but we are free to do so."  *Kelsey*, 567 F.3d at 61(citing *Pearson*,

129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question

after *Pearson* is 'which of the two prongs . . . should be addressed in light

of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430

n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be

appropriate in those cases where 'discussion of why the relevant facts do

not violate clearly established law may make it apparent that in fact the

relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567

F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is

clearly established is whether it would be clear to a reasonable officer that

his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S.

at 202, 121 S.Ct. at 2156 (citation omitted).  When deciding whether a right

was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable
> specificity"; (2) whether the decisional law of the Supreme
> Court and the [Second Circuit] support the existence of the
> right in question; and (3) whether under preexisting law a
> reasonable defendant official would have understood that his or
> her acts were unlawful.

*Wright v. Smith*, 21 F.3d 496, 500 (2d Cir. 1994) (quoting *Benitez v. Wolff*,

27

985 F.2d 662, 666 (2d Cir. 1993)).  The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights.  *Okin*, 577 F.3d at 433 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)).  "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin*, 577 F.3d at 433 (citing *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established.  *Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir.), *cert. denied*, 552 U.S. 818, 128 S. Ct. 109 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances.  *See id.; see also Dallio v. Santamore,* No. 9:06-CV-1154, 2010 WL 125774, at *14 (N.D.N.Y. Jan. 7, 2010) (Suddaby, J. and Homer, M. J.) ("As to [plaintiff's] excessive force and failure to intervene claims, it was clearly established

28

by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted . . . since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

IV.    SUMMARY AND RECOMMENDATION

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in

29

fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court.  I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity.  Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted.  Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      February 24, 2010
               Syracuse, NY

31



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
No. 01CIV.8235(AGS).

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages. Defendants have filed a motion to dismiss the action

pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

> FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4.*See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

***2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

*4 The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days. [FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner. [FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield, J., concluded that Samuels' appeal raised a substantial evidence question that could not be

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

resolved by "reference to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the

plaintiff[ ] can prove no set of facts in support of [his] claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146;*Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

***6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at *2-*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit,

*inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

a. Witnesses

*12 Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to him through the NYTS program with the authorization of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] pg 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation.[FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the "limited" assistance to which Samuels is entitled.[FN21] Such

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated. The search took place on October 20, 1999, and the

hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members of the NYTS were behind the planned Y2K protest. *See*

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

> FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his supervisor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the misbehavior adjudication. Consequently McKoy was not

personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in this case. The reason is that without having basic

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681etseq. ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here, the
opposing party has failed to comply with the Rule.
*See,e.g.,Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v.
Car-Freshner Corp.,* 49 F.Supp.2d 84, 86
(N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson
v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of
them, specialty, and failed the other, research methods.
Roopnarine, incidently, gave her a pass on specialty, and
a marginal on research methods. Thus it was another
professor who gave her a failing grade on research
methods, resulting in her failure of the exam. As to the
other failed exam, child development, it is undisputed that
Roopnarine neither wrote the question, nor graded the
answer.

Pursuant to the University's procedures, she retook the two
exams she failed in January of 1997. Despite being given
the same questions, she only passed one, child
development. She again failed research methods by getting
marginal and fail grades from her evaluators. This time,
Roopnarine was not one of the evaluators for either of her
exam questions.

After this second unsuccessful attempt at passing research
methods, plaintiff complained to the chair of the CFS
department, Dr. Norma Burgess. She did not think that she
had been properly prepared for her exam, and complained
that she could no longer work with Roopnarine because he
yelled at her, was rude to her, and was otherwise not
responsive or helpful. She wanted a new advisor. Plaintiff
gave no indication, however, that she was being sexually
harassed by Roopnarine.

Though plaintiff never offered any additional explanation
for her demands of a new advisor, Burgess eventually
agreed to change her advisor, due to plaintiff's insistence.
In March of 1997, Burgess and Roopnarine spoke, and
Roopnarine understood that he would no longer be
advising plaintiff. After that time period, plaintiff and
Roopnarine had no further contact. By June of that year,
she had been assigned a new advisor, Dr. Mellisa
Clawson.

Plaintiff then met with Clawson to prepare to take her
research methods exam for the third time. Despite
Clawson's repeated efforts to work with plaintiff, she
sought only minimal assistance; this was disturbing to
Clawson, given plaintiff's past failures of the research
methods exam. Eventually, Clawson was assigned to write
plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual
harassment was in August of 1997, soon before plaintiff
made her third attempt at passing research methods. She
complained to Susan Crockett, Dean of the University's
College of Human Development, the parent organization
of the CFS department. Even then, however, plaintiff
merely repeated the claims that Roopnarine yelled at her,
was rude to her, and was not responsive or helpful. By this
time Roopnarine had no contact with plaintiff in any event.
The purpose of plaintiff's complaint was to make sure that
Roopnarine would not be involved in her upcoming
examination as exam coordinator. Due to plaintiff's
complaints, Roopnarine was removed from all
involvement with plaintiff's third research methods
examination. As chair of the department, Burgess took
over the responsibility for serving as plaintiff's exam
coordinator. Thus, Burgess, not Roopnarine, was
responsible for receiving plaintiff's answer, selecting the
evaluators, and compiling the grades of these evaluators;
[FN3] as mentioned, Clawson, not Roopnarine, authored the
exam question.

> **FN3.** Plaintiff appears to allege in her deposition
> and memorandum of law that Roopnarine
> remained the exam coordinator for her third and
> final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of
> Law at 9. The overwhelming and undisputed
> evidence in the record establishes that
> Roopnarine was not, in fact, the coordinator of
> this exam. Indeed, as discussed above, the
> University submitted a Statement of Material
> Facts which specifically asserted in paragraph 18
> that Roopnarine was removed from all
> involvement in plaintiff's exam, including the
> role of exam coordinator. *See* Def.'s Statement of
> Material Facts at ¶ 18 (and citations to the record
> therein). Aside from the fact that this assertion is
> deemed admitted for plaintiff's failure to
> controvert it, plaintiff cannot maintain, without
> any evidence, that Roopnarine was indeed her
> exam coordinator. Without more than broad,
> conclusory allegations of same, no genuine issue
> of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See *Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

    FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

    FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

<div align="center">CONCLUSION</div>

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

Only the Westlaw citation is currently available.

Supreme Court of the United States
Jamey L. WILKINS, Petitioner,
v.
Officer GADDY.
**No. 08-10914.**

Feb. 22, 2010.

**Background:** State prisoner brought § 1983 action against corrections officer, alleging officer used excessive force against prisoner, in violation of Eighth Amendment prohibition of cruel and unusual punishment. The United States District Court Western District of North Carolina, Graham C. Mullen, J., 2008 WL 1782372, dismissed the action for failure to state a claim, and later denied prisoner's motion for reconsideration and for leave to file an amended complaint, 2008 WL 4005668. Prisoner appealed. The United States Court of Appeals for the Fourth Circuit, 2009 WL 159409, affirmed.

**Holdings:** Granting certiorari, the Supreme Court held that:
(1) the core judicial inquiry when a prisoner alleges that prison officers used excessive force against the prisoner is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm, abrogating Norman v. Taylor, 25 F.3d 1259, Riley v. Dorton, 115 F.3d 1159, and Taylor v. McDuffie, 155 F.3d 479, and
(2) prisoner stated a claim under § 1983 for use of excessive force.

Reversed and remanded.

Justice Thomas filed an opinion concurring in the judgment, in which Justice Scalia joined.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**West Headnotes**

**[1] Sentencing and Punishment 350H** 🗝 **1548**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1548 k. Use of Force. Most Cited Cases
The use of excessive physical force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury. U.S.C.A. Const.Amend. 8.

**[2] Sentencing and Punishment 350H** 🗝 **1548**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1548 k. Use of Force. Most Cited Cases
The core judicial inquiry when a prisoner alleges that prison officers used excessive force against the prisoner, in violation of the Eighth Amendment prohibition of cruel and unusual punishment, is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm; abrogating Norman v. Taylor, 25 F.3d 1259, Riley v. Dorton, 115 F.3d 1159, and Taylor v. McDuffie, 155 F.3d 479. U.S.C.A. Const.Amend. 8.

**[3] Sentencing and Punishment 350H** 🗝 **1548**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1548 k. Use of Force. Most Cited Cases
The absence of serious injury is not irrelevant to the inquiry regarding whether the force used against a prisoner was excessive force, in violation of the Eighth Amendment

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

prohibition of cruel and unusual punishment, because the extent of injury suffered is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, and the extent of injury may also provide some indication of the amount of force applied. U.S.C.A. Const.Amend. 8.

**[4]** Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1548 k. Use of Force. Most Cited Cases
Not every malevolent touch by a prison guard gives rise to a federal cause of action for excessive force in violation of the Eighth Amendment prohibition of cruel and unusual punishment. U.S.C.A. Const.Amend. 8.

**[5]** Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1548 k. Use of Force. Most Cited Cases
The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. U.S.C.A. Const.Amend. 8.

**[6]** Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1548 k. Use of Force. Most Cited Cases
An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim under the Eighth Amendment, which prohibits cruel and unusual punishment. U.S.C.A. Const.Amend. 8.

**[7]** Prisons 310 ☞ 124

310 Prisons
    310II Prisoners and Inmates
        310II(B) Care, Custody, Confinement, and Control
            310k124 k. Use of Force. Most Cited Cases

Sentencing and Punishment 350H ☞ 1548

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1548 k. Use of Force. Most Cited Cases
State prisoner's allegations that corrections officer punched, kicked, kneed, choked, and body slammed him maliciously and sadistically and without any provocation, leaving him with a bruised heel, back pain, and other injuries requiring medical treatment, stated a claim under § 1983 for use of excessive force, in violation of Eighth Amendment prohibition of cruel and unusual punishment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

PER CURIAM.

**\*1**[1] In Hudson v. McMillian, 503 U.S. 1, 4, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), this Court held that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." In this case, the District Court dismissed a prisoner's excessive force claim based entirely on its determination that his injuries were "de minimis." Because the District Court's approach, affirmed on appeal, is at odds with Hudson's direction to decide excessive force claims based on the nature of the force rather than the extent of the injury, the petition for certiorari is granted, and the judgment is reversed.

I

In March 2008, petitioner Jamey Wilkins, a North Carolina state prisoner, filed suit in the United States District Court for the Western District of North Carolina

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

pursuant to 42 U.S.C. § 1983. Wilkins' *pro se* complaint alleged that, on June 13, 2007, he was "maliciously and sadistically" assaulted "[w]ithout any provocation" by a corrections officer, respondent Gaddy.[FN1] App. to Pet. for Cert. C-4. According to the complaint, Gaddy, apparently angered by Wilkins' request for a grievance form, "snatched [Wilkins] off the ground and slammed him onto the concrete floor." *Ibid.* Gaddy "then proceeded to punch, kick, knee and choke [Wilkins] until another officer had to physically remove him from [Wilkins]." *Ibid.* Wilkins further alleged that, "[a]s a result of the excessive force used by [Gaddy], [he] sustained multiple physical injuries including a bruised heel, lower back pain, increased blood pressure, as well as migraine headaches and dizziness" and "psychological trauma and mental anguish including depression, panic attacks and nightmares of the assault." *Ibid.*

    FN1. The materials in the record do not disclose Gaddy's full name.

The District Court, on its own motion and without a response from Gaddy, dismissed Wilkins' complaint for failure to state a claim. Citing Circuit precedent, the court stated that, "[i]n order to state an excessive force claim under the Eighth Amendment, a plaintiff must establish that he received more than a *de minimus[sic]* injury." No. 3:08-cv-00138 (WD NC, Apr. 16, 2008), pp. 1, 2 (citing *Taylor v. McDuffie,* 155 F.3d 479, 483 (C.A.4 1998); *Riley v. Dorton,* 115 F.3d 1159, 1166 (C.A.4 1997) (en banc); footnote omitted). According to the court, Wilkins' alleged injuries were no more severe than those deemed *de minimis* in the Circuit's *Taylor* and *Riley* decisions. Indeed, the court noted, Wilkins nowhere asserted that his injuries had required medical attention.

In a motion for reconsideration, Wilkins stated that he was unaware that his failure to allege medical treatment might prejudice his claim. He asserted that he had been prescribed, and continued to take, medication for his headaches and back pain, as well as for depression. And he attached medical records purporting to corroborate his injuries and course of treatment.

*2 Describing reconsideration as "an extraordinary

remedy," the court declined to revisit its previous ruling. No. 3:08-cv-00138 (WD NC, Aug. 25, 2008), p. 1. The medical records, the court observed, indicated that some of Wilkins' alleged injuries "were pre-existing conditions." *Id.*, at 3. Wilkins had sought treatment for high blood pressure and mental health issues even before the assault. The court acknowledged that Wilkins received an X ray after the incident "to examine his 'bruised heel,' " but it "note[d] that bruising is generally considered a *de minimus[sic]* injury." *Id.,* at 4. The court similarly characterized as *de minimis* Wilkins' complaints of back pain and headaches. The court denied Wilkins leave to amend his complaint. In a summary disposition, the Court of Appeals affirmed "for the reasons stated by the district court." No. 08-7881 (CA4, Jan. 23, 2009).

II

In requiring what amounts to a showing of significant injury in order to state an excessive force claim, the Fourth Circuit has strayed from the clear holding of this Court in *Hudson.* Like Wilkins, the prisoner in *Hudson* filed suit under § 1983 alleging that corrections officers had used excessive force in violation of the Eighth Amendment. Evidence indicated that the officers had punched Hudson in the mouth, eyes, chest, and stomach without justification, resulting in "minor bruises and swelling of his face, mouth, and lip" as well as loosened teeth and a cracked partial dental plate. 503 U.S. at 4, 112 S.Ct. 995. A Magistrate Judge entered judgment in Hudson's favor, but the Court of Appeals for the Fifth Circuit reversed, holding that an inmate must prove "a significant injury" in order to state an excessive force claim. *Hudson v. McMillian,* 929 F.2d 1014, 1015 (1990)(per curiam). According to the Court of Appeals, Hudson's injuries, which had not required medical attention, were too "minor" to warrant relief. *Ibid.*

[2] Reversing the Court of Appeals, this Court rejected the notion that "significant injury" is a threshold requirement for stating an excessive force claim. The "core judicial inquiry," we held, was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S.Ct. 995; see also *Whitley v. Albers,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

475 U.S. 312, 319-321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Hudson, 503 U.S. at 9, 112 S.Ct. 995; see also id., at 13-14, 112 S.Ct. 995 (Blackmun, J., concurring in judgment) ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks").

[3][4][5][6] This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. Id. at 7, 112 S.Ct. 995. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.(quoting Whitley, 475 U.S. at 321, 106 S.Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9, 112 S.Ct. 995. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Ibid. (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Ibid. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)).

*3 Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury. Accordingly, the Court concluded in Hudson that the supposedly "minor" nature of the injuries "provide[d] no basis for dismissal of [Hudson's] § 1983 claim" because "the blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not de minimis for Eighth Amendment purposes." 503 U.S. at 10, 112 S.Ct. 995.

[7] The allegations made by Wilkins in this case are quite similar to the facts in Hudson, and the District Court's analysis closely resembles the approach Hudson disavowed. Wilkins alleged that he was punched, kicked, kneed, choked, and body slammed "maliciously and sadistically" and "[w]ithout any provocation." Dismissing Wilkins' action sua sponte, the District Court did not hold that this purported assault, which allegedly left Wilkins with a bruised heel, back pain, and other injuries requiring medical treatment, involved de minimis force. Instead, the court concluded that Wilkins had failed to state a claim because "he simply has not alleged that he suffered anything more than de minimus [sic] injury." No. 3:08-cv-00138 (WD NC, Apr. 16, 2008), at 2.

In giving decisive weight to the purportedly de minimis nature of Wilkins' injuries, the District Court relied on two Fourth Circuit cases. See Riley, 115 F.3d, at 1166-1168; Taylor, 155 F.3d, at 483-485. Those cases, in turn, were based upon the Fourth Circuit's earlier decision in Norman v. Taylor, 25 F.3d 1259 (1994) (en banc), which approved the practice of using injury as a proxy for force. According to the Fourth Circuit, Hudson "does not foreclose and indeed is consistent with [the] view ... that, absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injuries are de minimis." 25 F.3d at 1263.

The Fourth Circuit's strained reading of Hudson is not defensible. This Court's decision did not, as the Fourth Circuit would have it, merely serve to lower the injury threshold for excessive force claims from "significant" to "non-de minimis"-whatever those ill-defined terms might mean. Instead, the Court aimed to shift the "core judicial inquiry" from the extent of the injury to the nature of the force-specifically, whether it was nontrivial and "was applied ... maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S.Ct. 995. To conclude, as the District Court did here, that the absence of "some arbitrary quantity of injury" requires automatic dismissal of an excessive force claim improperly bypasses this core inquiry. Id. at 9, 112 S.Ct. 995.[FN2]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

FN2. Most Circuits to consider the issue have rejected the Fourth Circuit's *de minimis* injury requirement. See, *e.g., Wright v. Goord,* 554 F.3d 255, 269-270 (C.A.2 2009) ("[O]ur Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight.... [T]he absence of any significant injury to [the plaintiff] does not end the Eighth Amendment inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic"); *Smith v. Mensinger,* 293 F.3d 641, 648-649 (3d Cir.2002) ("[T]he Eighth Amendment analysis must be driven by the extent of the force and the circumstances in which it is applied; not by the resulting injuries. ... *[D]e minimis* injuries do not necessarily establish *de minimis force* "); *Oliver v. Keller,* 289 F.3d 623, 628 (9th Cir.2002) (rejecting the view "that to support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than *de minimis* physical injury" (internal quotation marks omitted)); *United States v. LaVallee,* 439 F.3d 670, 687 (10th Cir.2006) (same).

The Fifth Circuit has sometimes used language indicating agreement with the Fourth Circuit's approach. See, *e.g., Gomez v. Chandler,* 163 F.3d 921, 924 (1999) ("[T]o support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than *de minimis* injury"). But see *Brown v. Lippard,* 472 F.3d 384, 386 (2006) ("This Court has never directly held that injuries must reach beyond some arbitrary threshold to satisfy an excessive force claim"). Even in the Fifth Circuit, however, Wilkins likely would have survived dismissal for failure to state a claim because that court's precedents have classified the sort of injuries alleged here as non-*de minimis*. See, *e.g.,ibid.* (permitting a prisoner's Eighth Amendment excessive force claim to proceed to trial where evidence indicated that the prisoner suffered

"one-centimeter abrasions on both his left knee and left shoulder, pain in his right knee, and tenderness around his left thumb," as well as "back problems"); *Gomez,* 163 F.3d, at 922 (refusing to grant summary judgment on *de minimis* injury grounds where the prisoner alleged "physical pain [and] bodily injuries in the form of cuts, scrapes, [and] contusions to the face, head, and body").

*4 In holding that the District Court erred in dismissing Wilkins' complaint based on the supposedly *de minimis* nature of his injuries, we express no view on the underlying merits of his excessive force claim. In order to prevail, Wilkins will ultimately have to prove not only that the assault actually occurred but also that it was carried out "maliciously and sadistically" rather than as part of "a good-faith effort to maintain or restore discipline." *Ibid.* Moreover, even if Wilkins succeeds, the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover.

3

The petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, with whom Justice Scalia joins, concurring in the judgment.

I agree with the Court that the Fourth Circuit's Eighth Amendment analysis is inconsistent with *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). But I continue to believe that *Hudson* was wrongly decided. *Erickson v. Pardus,* 551 U.S. 89, 95, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (dissenting opinion); *Farmer v. Brennan,* 511 U.S. 825, 858, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (opinion concurring in judgment); *Helling v. McKinney,* 509 U.S. 25, 37, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (dissenting opinion); *Hudson,supra,* at 17, 112 S.Ct. 995 (dissenting opinion).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 596513 (U.S.)
(Cite as: 2010 WL 596513 (U.S.))

"At the time the Eighth Amendment was ratified, the word 'punishment' referred to the penalty imposed for the commission of a crime." *Helling,supra,* at 38, 113 S.Ct. 2475 (THOMAS, J., dissenting). The Court adhered to this understanding until 1976, when it declared in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, that the Cruel and Unusual Punishments Clause also extends to prison conditions not imposed as part of a criminal sentence. See generally *Hudson,supra,* at 18-20, 112 S.Ct. 995 (THOMAS, J., dissenting); *Farmer,supra,* at 861, 114 S.Ct. 1970 (THOMAS, J., concurring in judgment). To limit this abrupt expansion of the Clause, the Court specified that its new interpretation of the Eighth Amendment should not extend to every deprivation a prisoner suffers, but instead should apply "*only* [to] that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Hudson,supra,* at 20, 112 S.Ct. 995 (THOMAS, J., dissenting) (citing *Estelle,supra,* at 106, 97 S.Ct. 285); see generally *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

*Hudson,* however, discarded the requirement of serious injury. Building upon *Estelle's* mislaid foundation, the Court concluded that force, rather than injury, is the relevant inquiry, and that a prisoner who alleges excessive force at the hands of prison officials and suffers nothing more than *de minimis* injury can state a claim under the Eighth Amendment. *Hudson* thus turned the Eighth Amendment into "a National Code of Prison Regulation," 503 U.S. at 28, 112 S.Ct. 995 (THOMAS, J., dissenting); *Farmer,* 511 U.S. at 859, 114 S.Ct. 1970 (THOMAS, J., concurring in judgment), with "federal judges [acting as] superintendents of prison conditions nationwide," *id.,* at 860, 114 S.Ct. 1970. Although neither the Constitution nor our precedents require this result, no party to this case asks us to overrule *Hudson.* Accordingly, I concur in the Court's judgment.

U.S.,2010.
Wilkins v. Gaddy
--- S.Ct. ----, 2010 WL 596513 (U.S.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *prose,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to stop
Noone from using excessive force, and (3) both Noone
and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment
of the Constitution. Defendants now move for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken
by Dickenson, he stopped and Dickenson brought him to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

*2 Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65,

6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at *3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *prose* submissions, particularly those alleging civil rights violations, are construed liberally and are treated as raising the strongest arguments that they might

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988) (defendant entitled to judgment where

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244;*Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003)* (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to his needs. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. See*Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Thomas DALLIO, Plaintiff,
v.
Scott SANTAMORE; William Comstock; Frank Buksa;
Amos LeClaire; Alicia McGuoirk; Lawrence
Hopkinson; Craig Ramsdell; Andrew Bouchey; Paul
Gilmore; Donald Quinn; Roy Girdich; C.O. Gettman;
Lt. O'Connell; R.N. Kimberly Perrea; R.N. Lillian
Riley; and R.N. Debra Smith, Defendants.
**No. 9:06-CV-1154 (GTS/DRH).**

Jan. 7, 2010.

Thomas Dallio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Dean J. Higgins, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**DECISION and ORDER**

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner civil
rights action filed by Thomas Dallio ("Plaintiff") against
sixteen employees of the New York State Department of
Correctional Services ("Defendants") are (1) Defendants'
motion for summary judgment (Dkt. No. 78), (2) United
States Magistrate Judge David R. Homer's
Report-Recommendation recommending that Defendants'
motion be granted in part and denied in part (Dkt. No. 87),
and (3) Plaintiff's Objections to the
Report-Recommendation (Dkt. No. 88). For the following
reasons, Plaintiff's Objections are rejected; the

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Report-Recommendation is accepted and adopted in its
entirety; Defendants' motion is granted in part and denied
in part; and Plaintiff's Complaint is dismissed in part.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**

Plaintiff filed his Complaint in this action on September
27, 2006. (Dkt. No. 1.)

Construed with the utmost of liberality, Plaintiff's
Complaint alleges that, between approximately November
10, 2003, and November 20, 2003, while he was
incarcerated at Upstate Correctional Facility in Malone,
New York, the above-captioned Defendants violated his
rights in the following manner: (1) by subjecting him to
excessive force in violation of the Eighth Amendment; (2)
by failing to intervene to prevent others from subjecting
him to excessive force, in violation of the Eighth
Amendment; (3) by being deliberately indifferent to his
serious medical needs, in violation of the Eighth
Amendment; (4) by conspiring to violate his
aforementioned constitutional rights; and (5) by
committing various torts against him (including assault,
battery and negligence) under New York State law. (*See
generally* Dkt. No. 1 [Plf.'s Compl.].)

More specifically, Plaintiff alleges as follows: (1)
Defendants Santamore, Comstock, LaClaire, Buksa,
Ramsdell, and Hopkins assaulted him after he was fully
restrained in his cell; (2) Defendants Gilmore and
McGuoirk failed to intervene during this incident; (3)
Defendants Riley and Perrea failed to properly treat him
for his subsequent injuries; and (4) Defendants conspired
against him by falsifying investigative reports and medical
records. (*Id.*)

For a more detailed recitation of Plaintiff's factual
allegations, the Court refers the reader to the Complaint in

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

its entirety, and Magistrate Judge Homer's Report-Recommendation. (Dkt.Nos.1, 87.)

**B. Defendants' Motion for Summary Judgment and Plaintiff's Response**

On October 1, 2008, Defendants filed a motion for summary judgment. (Dkt. No. 78.) In their motion, Defendants argue that Plaintiff's Complaint should be dismissed for the following reasons: (1) Plaintiff has failed to establish an excessive-force claim and/or a failure-to-intervene claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff was subjected to force that was sufficiently serious or that Defendants used that force with a sufficiently culpable mental state; (2) Plaintiff has failed to establish a medical-indifference claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff experienced a medical need that was sufficiently serious or that Defendants were deliberately indifferent to such a medical need; (3) Defendants are protected from liability as a matter of law by the doctrine of qualified immunity; (4) Plaintiff has failed to establish a conspiracy claim because insufficient record evidence exists from which a rational fact finder could conclude that Defendants reached an agreement to deprive Plaintiff of his constitutional rights; and (5) Plaintiff's pendant state law claims (of assault, battery and negligence) should be dismissed under the Eleventh Amendment and New York Corrections Law § 24 because (a) Plaintiff sued Defendants for damages arising out of acts that they allegedly performed or failed to perform within the scope of their employment, and (b) New York Civil Law Practice Law and Rules § 215(3) bars Plaintiff's intentional tort claims on the ground of untimeliness. (Dkt. No. 78, Attachment 20, at 7-18.)

*2 On October 31, 2008, Plaintiff filed his response in opposition to Defendants' motion. (Dkt. No. 85.) In his response, Plaintiff argues as follows: (1) he has adduced sufficient record evidence to establish an excessive-force claim and a failure-to-intervene claim under the Eighth Amendment; (2) he has adduced sufficient record evidence to establish a medical-indifference claim under

the Eighth Amendment; (3) Defendants are not protected from liability as a matter of law by the doctrine of qualified immunity, based on the current record; and (4) Plaintiff has adduced sufficient record evidence to establish a conspiracy claim. (Dkt. No. 85, Attachment 2, at 1-14.) In addition, Plaintiff concedes that his state law claims are barred by New York Corrections Law § 24. (*Id.* at 13.)

**C. Magistrate Judge Homer's Report-Recommendation**

On October 26, 2009, Magistrate Judge Homer issued a Report-Recommendation recommending as follows: (1) that all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley be dismissed with prejudice pursuant to Fed.R.Civ.P. 56; [FN1] (2) that Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore *not* be dismissed pursuant to Fed.R.Civ.P. 56 due to the existence of genuine issues of material fact regarding those claims; and (3) that Plaintiff's claims against Defendant Smith be dismissed without prejudice for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b). (Dkt. No. 87.)

> FN1. The Court notes that included in these claims are all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims. (Dkt. No. 87, at 14-20.) The Court notes also that Magistrate Judge Homer recommends the dismissal of all of Plaintiff's claims against Defendants Bouchey and Gettman based on Plaintiff's failure to demonstrate their personal involvement in the constitutional violations alleged. (*Id.* at 20-21.)

**D. Plaintiff's Objections**

On November 4, 2009, Plaintiff timely filed his Objections to the Report-Recommendation. (Dkt. No. 88.) In his Objections, Plaintiff asserts, *inter alia,* the following arguments: (1) he did not hit his head against the wall, but

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

rather his injuries were caused by Defendants, a fact that Defendants are collectively trying to "cover up"; [FN2] (2) because Magistrate Judge Homer failed to refer to a number of his exhibits in the Report-Recommendation, he failed to resolve all ambiguities and draw all reasonable inferences in his favor; (3) Plaintiff did not receive adequate due process during his grievance investigation in that he was denied an opportunity to "present witnesses and other evidence in support of his Grievance Complaint"; and (4) Defendants Perrea, Riley, Girdich, and O'Connell should not be dismissed from the action because the record evidence demonstrates that these Defendants "act[ed] in concert with each other to participate in the violation of Plaintiff's Eighth Amendment rights." (Dkt. No. 88, at 1-5.)

FN2. More specifically, Plaintiff argues that Defendant McGuoirk and the Department of Correctional Services ("DOCS") Inspector General's investigator tried to "cover up" the fact that he did not hit his head. To the extent that Plaintiff is attempting to assert, for the first time, a claim against the DOCS Inspector General's investigator, such a claim is dismissed because, among other things, the DOCS Inspector General is not a named party Defendant. Excell v. Burge, 05-CV-1231, 2008 WL 4426647, at *3 n. 4 (N.D.N.Y. Sept. 25, 2008) (Kahn, J. adopting DiBianco, M.J.) (noting that a person "not listed in the caption and ... never served with process ... is not ... a defendant [in the action]").

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report-Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C).[FN3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest

injustice. See Brown v. Peters, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[FN4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. See Batista v. Walker, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN3. On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. See, e.g., Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN4. See also Vargas v. Keane, 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), cert. denied, 519 U.S. 895 (1996).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

**B. Standard Governing a Motion for Summary Judgment**

**\*3** Magistrate Judge Homer correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 87, at 8-9.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS**

After carefully reviewing all of the papers herein, including Magistrate Judge Homer's thorough Report-Recommendation, the Court can find no error (clear or otherwise) in the Report-Recommendation. Magistrate Judge Homer employed the proper standards to Plaintiff's claims, accurately recited the facts surrounding these claims, and reasonably applied the law to those facts. The Court would only add the following three observations.

First, with regard to Plaintiff's argument that he did not receive adequate due process during his grievance investigation, the Court declines to consider the due process claim implicitly asserted in the argument because Plaintiff is asserting that due process claim for the first time in his Objections to the Report-Recommendation. *Williams v. Cooney,* 01-CV-4623, 2004 WL 434600, at \*2 n. 1 (S.D.N.Y. Mar. 8, 2004) (noting that a district court "has discretion to review arguments which are raised for the first time in objections to the Report"). In any event, even if the Court were to consider this late-blossoming due process claim, the Court would reject that claim on three alternative grounds: (1) Plaintiff has failed to introduce any admissible record evidence that he exhausted his administrative remedies with regard to this claim; (2) Plaintiff has failed to introduce any admissible record evidence that he was in fact not provided with an opportunity to present evidence in support of his grievance; and (3) "the manner in which grievance investigations are conducted do[es] not create a protected liberty interest." *Odom v. Poirier,* 99-CV-4933, 2004 WL 2884409, at \*10 (S.D.N.Y. Dec. 10, 2004) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 [S.D.N.Y.2003] ),

*accord Thomas v. Picio,* 04-CV-3174, 2008 WL 820740, at \*5 n. 5 (S.D.N.Y. Mar. 26, 2008). For all of these reasons, the Court rejects Plaintiff's newly asserted due process claim.

Second, with regard to Plaintiff's argument that Magistrate Judge Homer's omission of references to Plaintiff's numerous exhibits in the Report-Recommendation is evidence that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor, this argument fails to specifically address any of Magistrate Judge Homer's factual or legal conclusions. Instead, the argument generally attacks the findings and conclusions of the Report-Recommendation. As a result, the portion of the Report-Recommendation challenged by the argument is subject to only clear-error review. In any event, this portion of Magistrate Judge Homer's Report-Recommendation, as well as the other portions of his Report-Recommendation, would survive even a *de novo* review. Contrary to Plaintiff's argument, Magistrate Judge Homer relied on Plaintiff's version of the facts (and thus on Plaintiff's exhibits) in concluding that a question of material fact exists regarding Plaintiff's excessive-force claims and failure-to-intervene claims. For these reasons, the Court rejects Plaintiff's argument that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor.

**\*4** Finally, with regard to Plaintiff's argument that he did not hit his head against the wall, but rather his injuries were caused by Defendants, and Defendants are collectively trying to "cover up" this fact, Plaintiff has failed to point to (or introduce in his Objections) any admissible record evidence as to when, where, or how Defendants came together and planned to (1) assault him, and (2) subsequently cover up the assault. As a result, the Court rejects Plaintiff's argument that his conspiracy claim should survive summary judgment.

For all of these reasons, Magistrate Judge Homer's Report-Recommendation is accepted and adopted in its entirety.

**ACCORDINGLY,** it is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

**ORDERED** that Magistrate Judge Homer's Report-Recommendation (Dkt. No. 87) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 78) is ***GRANTED*** in part and ***DENIED*** in part, in the following regards:

(1) all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley (including all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims) are ***DISMISSED*** **with prejudice** pursuant to Fed.R.Civ.P. 56;

(2) Plaintiff's claims against Defendant Smith are ***DISMISSED*** **without prejudice** for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b);

(3) remaining in this action, following the issuance of this Decision and Order, are Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore. (Plaintiff's claims against these Defendants are *not* dismissed due to the existence of genuine issues of material fact regarding those claims.)

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> [FN1.] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Thomas Dallio ("Dallio"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this civil rights action pursuant to 42 U.S.C. §§ 1981, 1983, and 1985 alleging that defendants, sixteen DOCS employees, violated his constitutional rights under the Eighth

Amendment. Compl. (Docket No. 1). Presently pending is the motion of fifteen of the defendants [FN2] for summary judgment pursuant to Fed.R.Civ.P. 56. Docket Nos. 78, 79, 83, 84. Dallio opposes the motion. Docket No. 85. For the following reasons, it is recommended that the motion be granted in part and denied in part.

> [FN2.] Defendant R.N. Debra Smith has never been served with process or otherwise appeared in the action. *See* Docket Nos. 11 (summons returned unexecuted as to Smith after service was attempted by the United States Marshals Service), 36 & 38 (answers filed for 11 defendants except Smith), 78-1 (defendants' motion herein filed on behalf of all defendants except Smith). Under Fed.R.Civ.P. 4(m), a complaint must be served upon a defendant within 120 days. *See also* N.D.N.Y.L.R. 4.1(b) (same). The complaint herein was filed on September 27, 2006 and the summonses were issued on November 20, 2006. Docket No. 1; Docket entry dated Nov. 20, 2006. Thus, more than 120 days have elapsed without completion of service of process on Smith. Accordingly, it is recommended that the complaint be dismissed without prejudice as to Smith in accordance with Rule 4(m) and Local Rule 4.1(b).

**I. Background**

The facts are related herein in the light most favorable to Dallio as the non-moving party. *See* subsection II(A) *infra*.

**A. The Incident**

On November 10, 2003, defendants Scott Santamore and William Comstock, corrections officers at Upstate Correctional Facility, arrived at Dallio's cell to escort him to a holding area while his cell was searched. Compl. ¶ 19; Comstock Decl. (Docket No. 78-11) ¶ 1; Santamore Decl. (Docket No. 78-10) ¶ 2. After the search, Santamore and Comstock escorted Dallio back to his cell and instructed him to stand against the wall so that his waist chain could be removed. Comstock Decl. ¶¶ 1-3; Santamore Decl. V

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

3. The waist chain was removed, Dallio was ordered to turn and proceed into his cell, and when Dallio turned, he punched Comstock in the face. Comstock Decl. ¶¶ 3-5; Santamore Decl. ¶¶ 5-7; Dallio Decl. (Docket No. 85-2) ¶ 6; Dallio Dep. Tr. (Docket No. 78-14) at 26. A struggle ensued as Comstock, Santamore, and Dallio all fell into Dallio's cell. Comstock Decl. ¶ 6-8; Santamore Decl. ¶¶ 8-12.

**\*5** An alarm was sounded and a response team composed of defendants Alicia McGuoirk, Amos LaClaire,[FN3] Frank Buksa, Craig Ramsdell, Lawrence Hopkins, and Paul Gilmore quickly arrived at Dallio's cell. Docket No. 78, Ex. D at 28, 32-35; LaClaire Decl. (Docket No. 78-4) ¶ 1; Buksa Decl. (Docket No. 78-5) ¶ 1; Ramsdell Decl. (Docket No. 78-6) ¶ 2; Hopkinson Decl. (Docket No. 78-7) ¶ 2; Gilmore Decl. (Docket No. 78-9) ¶¶ 3-5. Dallio immediately fell to the ground, was restrained, and ceased physical resistance but was then kicked and punched over twenty times in his face, abdomen, back, and legs. Dallio Decl. ¶¶ 2, 6-7, 15; Dallio Dep. at 31-37. Gilmore and McGuoirk stood by while Santamore, Comstock, LaClaire, Buksa, Ramsdell, and Hopkinson assaulted Dallio. Dallio Decl. ¶¶ 16, 18.[FN4] During the incident, Dallio's arms (Gilmore Decl. ¶ 13; Hopkinson Decl. ¶¶ 3-4; LaClaire Decl. ¶ 2; Docket No. 78, Ex. D at 33, 35) and legs (Gilmore Decl. ¶ 12; Ramsdell Decl. ¶ 4; Buksa Decl. ¶ 1; Docket No. 78, Ex. D at 32, 34) were restrained, immobilized with a bed sheet (Gilmore Decl. ¶¶ 12, 14, 15; Buksa Decl. ¶¶ 1-2), and Dallio was placed under his bunk without further incident. Gilmore Decl. ¶ 16; Buksa Decl. ¶ 3; Docket No. 78, Ex. D at 32.[FN5] Dallio was then left alone in his cells.[FN6]

FN3. The complaint spells the name as "LeClaire." Compl. The correct spelling is LaClaire." *See* LaClaire Decl. (Docket No. 78-4). The correct spelling will be used herein.

FN4. Defendants dispute Dallio's account.

FN5. A video tape was made by a surveillance camera fixed on the hallways outside Dallio's cell which shows the events which occurred outside the cell but not those inside. It also contains

sound recordings of the raised voices while the parties were inside the cell. *See* Video (Docket No. 78-20). The video shows Dallio strike Comstock, Comstock, Santamore, and Dallio then tumbling into Dallio's cell, and officers responding to the cell. Dallio can be heard on the tape yell that he was not resisting and that excessive force was occurring. *Id.; see also* Dallio Dep. Tr. at 28 (testifying that he agreed that the video was an accurate depiction of what occurred in the hallway).

FN6. McGuoirk was then sent back to Dallio's cell to check on him and heard strange noises coming from his cell. McGuoirk Decl. ¶ 4. McGuoirk observed Dallio hitting his head and rubbing his face against the wall multiple times. *Id.* ¶¶ 4-6. McGuoirk reported this behavior to Gilmore and the medical department. *Id.* ¶ 7. McGuoirk then returned to Dallio's cell and observed him engaging in the same activity. *Id.* ¶¶ 8-9. Dallio now denies this conduct, but during an interview with the DOCS Inspector General's investigator, Dallio admitted to hitting his head against the wall of his cell in frustration after the incident. Docket No. 83, Ex. E at 169.

Later that day, Dallio was issued a misbehavior report which charged him with violating a direct order, assault on a staff member, and violent conduct. Docket No. 78, Ex. D at 22. A disciplinary hearing was conducted on the charges and at its conclusion, Dallio was found guilty of all three charges. Docket No. 78, Ex. D at 17; *see also* Docket No. 78, Ex. D at 68-150 (disciplinary hearing transcript). After administrative appeals, Dallio received a total sentence of twenty-four months in the special housing unit (SHU)[FN7] and twenty-four months loss of packages, commissary, and telephone privileges. Docket No.78, Ex. D at 13-16.

FN7. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On November 24, 2003, Dallio filed a grievance against the defendants for the alleged assault. Docket No. 78, Ex. F at 4. After an investigation, defendant Donald Quinn determined that "[b]ased on the documentation submitted and Inmate Dallio's lack of witnesses or evidence his allegations cannot be substantiated." Docket No. 78, Ex. F at 7; *see also* Docket No. 78, Ex F at 7-60 (attachments of all documents and interviews considered during the investigation). The grievance was denied based on the internal investigation. Docket No. 78, Ex. F at 3. Dallio appealed, but the denial was affirmed, based upon both the findings of the internal investigation and the outcome of Dallio's disciplinary hearing. Docket No. 78, Ex. F at 2-3.

On November 24, 2003, Dallio filed a complaint with the Office of the DOCS Inspector General (IG) concerning the incident. Docket No. 83, Ex. E at 15-19. After another lengthy investigation, the IG concluded that the "[m]edical documentation and photo's [we]re consistent with The Use of Force reported by [the defendants]" and that Dallio's allegations were unsubstantiated. Docket No. 83, Ex. E at 1-2; *see also* Docket No. 83, Ex. E at 20-180 (compilation of all the correspondence, interviews, documentation, photographs, and records utilized by the IG in evaluating Dallio's complaints).

**B. Medical Treatment**

*6 After the incident, Dallio was taken to the medical department where defendant Kimberly Perrea, a registered nurse, and Perrea completed a physical examination. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 19; Docket No. 85, Ex. I. Examination revealed (1) bruising and superficial abrasions to the forehead, (2) bruising on both cheeks, (3) bruising and swelling of the bridge of Dallio's nose, (4) one superficial abrasion on the left elbow, (4) superficial abrasions to the left shoulder and bruising to the left clavicle, (5) swelling and abrasions on the right flank, (6) a bruised right knee, (7) a bruised right hip with superficial abrasions, (8) redness throughout the middle and lower portions of Dallio's spine and back,

sternum, and front of the neck, and (9) superficial abrasions and redness on Dallio's right wrist. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 36; Docket No. 85 Ex. I. The medical report indicated that Dallio should cleanse the areas which received abrasions with soap and water when he returned to his cell. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. During his deposition, Dallio testified that he suffered from internal bleeding in his eye, injuries to his spinal area, difficulty walking, bruising throughout his face and legs, and lacerations. Dallio Dep. at 45-48. Defendants Lt. O'Connell and Roy Girdich both subsequently made rounds after the incident and observed Dallio's condition and failed to take any actions. Compl. ¶¶ 35, 44-45.

On November 11, 2003, Dallio was examined by a non-party member of the medical staff who noted Dallio's subjective complaints of bruising on his head, legs, back and stomach, chest pains, and difficulty breathing. Docket No. 83, Ex. E at 144. There was no physician or nurse practitioner on duty due to the holiday and when Dallio was informed of this, he became upset. *Id.* Dallio appeared in no obvious distress and could breathe easily as he had no difficulty yelling at the nurse. *Id.* Later that day, Dallio sought emergency treatment to see a physician but was warned that his current medical condition was not an emergency and that further abuse of the system would result in a misbehavior report. *Id.*

On November 12 and 13, 2003, Dallio complained of a spinal injury from the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. (Docket No. 78-8) ¶ 5 (noting Dallio's complaints of discomfort, desire to see a chiropractor, the absence of objective signs of distress, and that he was given Tylenol to relieve pain). Both days, Dallio was observed standing in no distress, waving his extremities without any difficulty with his range of motion, responding easily to questions and yelling at staff to express his displeasure, and was treated with pain relievers. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 9 ("At times from November 10, 2003 to November 15, 2003 [Dallio] frequently yelled at me...."). Additionally, Dallio complained of an injury to his right eye which was not noted to have occurred at the time of the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 6 (noting that "medical records for November 14, 2003 reveal that other medical personnel observed no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

injury to either of his eyes."). When the eye was examined, it was found to be reddened but without symptoms. Docket No. 83, Ex. E at 143. Dallio asked to be referred to a chiropractor for his complaints of spinal pain. Docket No. 83, Ex. E at 143.

**\*7** The following two days, November 14 and 15, 2003, Dallio continued to complain about his eye injury. Docket No. 83, Ex. E at 141-42. Dallio was seen by optometry on July 3, 2003 and by ophthalmology on October 9, 2003, his eye was reddened, but no further treatment was indicated. Docket No. 83, Ex. E at 141-42. Dallio was again noted to be moving all extremities without difficulty, standing in no apparent distress, ambulating without difficulty, speaking clearly, and continually yelling at medical staff. Docket No. 83, Ex. E at 141-42.[FN8] Again on November 17, 2003, Dallio was noted to have no difficulty with ambulation, movement, or speech. *Id.*

> FN8. Dallio's examination was eventually terminated due to his behavior. Docket No. 83, Ex. E at 141-42. It was similarly terminated on November 17 due to his behavior and aggression toward staff. Docket No. 83, Ex. E at 141.

On November 18, 2003, Dallio requested treatment for injuries suffered during the incident. Docket No. 83, Ex. E at 140. Dallio was offered Tylenol and Motrin, and refused both. *Id.* He again demanded to see an eye doctor. *Id.* On November 20, Dallio lodged his last eye complaints of back pain. *Id.* He again refused pain medication and was noted to be waving his arms around wildly and yelling at staff. *Id.* After twenty minutes, the examination was terminated due to Dallio's behavior. *Id.*

This action followed.

## II. Discussion[FN9]

> FN9. Initially Dallio alleged pendant state law claims for assault, battery, and negligence. However, he has since conceded that his state law claims are barred. Plaintiff's Memorandum

of Law (Docket No. 85-3) at 13. Accordingly, defendants' motion as to those claims should be granted.

In his complaint, Dallio alleges that defendants have violated his Eighth Amendment rights by subjecting him to excessive force, failing to intervene, and being deliberately indifferent to his serious medical needs. Additionally, Dallio alleges that defendants conspired to falsify reports and medical records and to remain silent about his injuries after the incident to make him appear culpable for the incident. The moving defendants seek summary judgment on all claims.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*8** When, as here, a party seeks summary judgment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

**B. Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

**1. Excessive Force**

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*9** In this case, the moving defendants have proffered substantial evidence to refute Dallio's claim of excessive force. The defendants themselves have offered affidavits that the force used was only that necessary to restrain Dallio from assaulting officers further. Dallio was found guilty of assault and that finding was affirmed on administrative appeal. The video tape confirms Dallio's assault on Comstock. An independent investigation by the IG found no basis for Dallio's contentions. The physical injuries allegedly suffered by Dallio were consistent with the self-inflicted injuries observed by McGuoirk. Opposed to this evidence are only Dallio's own testimony and his voice on the video tape asserting that the officers were assaulting him in his cell after he had been restrained.

The question presented by this motion, then, is whether any question of fact exists as to whether any defendant used excessive force against Dallio or failed to intervene to prevent the use of such force. The evidence must be construed in the light most favorable to Dallio as the non-moving party. So construed, Dallio's testimony and statements heard on the vido tape stand in stark contrast to the substantial evidence proffered by defendants. This competing evidence rests on each side on the credibility of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

Dallio on the one hand and defendants on the other. In
these circumstances, the governing law that the evidence
must be viewed in the light most favorable to the
non-moving party leaves no choice but to credit Dallio's
version of events for purposes of this motion. *See In re
Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding
that a court faced with a motion for summary judgment
must draw all reasonable inferences in favor of the
non-moving party and may not make credibility
determinations or weigh the evidence, functions which are
reserved to a jury and not a judge) (citing cases).

As described above, Dallio's evidence would concede that
he in fact struck Comstock but that he was quickly
restrained in his cell and, so restrained and defenseless,
was struck repeatedly by Comstock, Santamore, LaClaire,
Buksa, Ramsdell, and Hopkinson while Gilmore and
McGuirk stood by and took no steps to intervene. Despite
the relatively minor injuries Dallio suffered, the
defendants' actions in assaulting an inmate who was
restrained and compliant could constitute a *per se*
constitutional violation. Thus, viewing the facts in the light
most favorable to Dallio, he has proffered sufficient
evidence to raise an issue of fact as to the objective prong
of the Eighth Amendment analysis to require resolution by
a jury.

Furthermore, if Dallio's evidence is credited, defendants'
actions could be found wanton and malicious. The need
for force dramatically subsided once Dallio was restrained
and compliant on the ground. Viewing the facts in the light
most favorable to Dallio, defendants continued to assault
him. This conduct could be found unreasonable and
unnecessary to sustain institutional order and safety once
Dallio was compliant. Thus, such actions, as alleged by
Dallio, are more than sufficient as well to raise a question
of material fact as to the subjective prong of the Eighth
Amendment analysis.

*10 Accordingly, defendants' motion for summary
judgment should be denied as to defendants Comstock,
Santamore, LaClaire, Buksa, Ramsdell, and Hopkinson on
Dallio's claim of excessive force.

**2. Failure to Intervene**

Daillo further claims that Gilmore and McGuoirk failed to
intervene when they saw the other defendants assaulting
him. Prison officials are obliged to protect prisoners from
known harms. *Farmer,* 511 U.S. at 829. "Law
enforcement officials can be held liable under § 1983 for
not intervening in a situation where excessive force is
being used by another officer." *Jean-Laurent v.
Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)
(citations omitted). In order to establish liability, a
plaintiff must demonstrate that "(1) the officer had a
realistic opportunity to intervene and prevent the harm; (2)
a reasonable person in the officer's position would know
that the victim's constitutional rights were being violated;
and (3) the officer does not take reasonable steps to
intervene." *Id.*

Viewing the facts in the light most favorable to Dallio, he
has raised a material issue of fact as to the failure to
intervene of Gilmore and McGuoirk. While the two
defendants may not have had advanced warning that the
other defendants' attack against Dallio when they
responded to the alarm and arrived at Dallio's cell, it
became clear when Dallio was restrained and became
compliant that Gilmore and McGuoirk could and should
intercede to prevent additional harm when they observed
six officers punching and kicking a defenseless inmate.
Additionally, as discussed *infra,* a reasonable person in the
officer's position would be well aware that such a use of
force was contrary to an individual's constitutional rights.
Thus, crediting Dallio's evidence, by standing idly by,
Gilmore and McGuoirk failed to take no reasonable steps
to intervene and terminate the violation of Dallio's
constitutional rights. This conclusion is further supported
as to Gilmore in light of his position as a supervisor,

Therefore, defendants' motions for summary judgment on
Dallio's claim against Gilmore and McGuoirk for failing
to intervene should be denied.

**3. Medical Treatment**[FN10]

FN10. Liberally construing Dallio's complaint,
he alleges deliberate indifference to his cardiac

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

conditions as well. Defendants traditionally filed Dallio's medical record. Docket No. 78, Ex. G. There are no indications of deliberately indifferent to Dallio's treatment. In the four months following the incident, Dallio was examined solely for cardiac issues on twenty different occasions, underwent four diagnostic tests, signed four refusals of treatment, and had one referral to a specialist. Additionally, from June 2005 until June 2007, Dallio's medical records reflect at least sixty related examinations for cardiac care, six diagnostic examinations revealing unremarkable results, four specialist consultations, five trips for emergency medicine, and nine treatment refusals. These 600 pages of records confirm that defendants were actively involved in Dallio's care on a near-daily basis and were neither deliberately indifferent nor delayed any treatments. Any claims based on Dallio's alleged cardiac condition should, therefore, be denied.

The Eighth Amendment prohibition also extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and

substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (*citing Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*11** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Defendants correctly contend that, even viewing the facts in the light most favorable to Dallio, the bleeding in his right eye, bruises, and superficial abrasions were insufficient to constitute a serious medical condition either separately or in combination. In a recent decision in this district in another case, Dallio's Eighth Amendment claims for similar injuries sustained in another incident were deemed insufficient on a motion for summary judgment. *See Dallio v. Herbert,* No. 06-CV-118 (GTS/GHL), 2009 WL 2258964, at \*5 (N.D.N.Y. July 28, 2009) (granting judgment to defendants for lack of serious injuries where Dallio suffered black eyes, bruising in his abdomen and kidney area, kick marks to his abdomen, open lacerations and bruising on his knees, lacerations on his arms and wrists, a headache, and numbness in his hands and fingers) (citing cases).

Even assuming that Dallio has raised a question of fact on this prong, he has still failed to prove deliberate indifference to that condition. Dallio received medical attention immediately after the incident, complaining of relatively minor injuries that only required cleansing with soap and water. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. Dallio disagreed with this course of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

treatment, but such disagreements are insufficient to sustain a constitutional violation. *Sonds,* 151 F.Supp.2d at 312.

Moreover, in the following ten days, Dallio was seen by the medical staff on eight of those days. Docket No. 84, Ex. E at 140-44. Thus, despite Dallio's conclusory allegations of a failure to provide medical treatment, the record demonstrates that medical staff treated Dallio on a near-daily basis. Such involvement with an inmate's care is not indifferent. Additionally, examination of Dallio generally revealed that he was standing and waiting at his cell door, he ambulated without any difficulty, he appeared in no physical distress, and he had no problem speaking clearly, yelling, or waving his arms at medical staff to signify his displeasure.[FN11] *Id.* Such uncontradicted determinations by multiple individuals, both parties and non-parties to this action, belie Dallio's subjective and uncorroborated complaints of disabling pain and indifferent treatment. Additionally, Dallio was consistently offered pain medication to increase his level of comfort. On at least two occasions, Dallio refused this medication. Docket No. 83, Ex. E at 140. Dallio's voluntary actions in refusing the pain medication cannot be attributed to any alleged delay or interference by any defendant.

> FN11. Any allegations that Dallio's progressive and frequent fits of rage were exaggerated or contrived are belied by the medical record which indicates at least twenty-seven instances from June 2005 until June 2007 where Dallio showed extreme anger and yelled at staff. Additionally, from prior to the incident until January 2004, there were seventeen similar instances where Dallio became argumentative and uncooperative with medical staff generally resulting in the termination of the examination.

*12 Furthermore, Dallio's contentions that he had injured his eye are not supported by any objective medical evidence. While it is undisputed that Dallio suffered from a reddened eye, the cause and timing of the irritation is immaterial to this claim, for medical staff noted and evaluated the condition and determined that it was not an emergency. Docket No. 83, Ex. E at 143. These findings were supported by the multiple record entries, by multiple

medical staff, which agreed that there was no injury to the eye. Riley Decl. ¶ 6. No medical evidence has been proffered by Dallio to the contrary. Even if there was an injury and the multiple opposing medical conclusions were wrong, the misdiagnosis would, at worst, constitute negligence. *See Estelle,* 429 U.S. at 107. This is still insufficient to sustain a claim for deliberate indifference. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Moreover, to the extent that Dallio contends that he should have been seen by a chiropractor or eye doctor,[FN12] such contentions are also insufficient to support a constitutional claim. Docket No. 83, Ex. E at 143. An inmate has no right to a physician of his or her choosing. *See Dean v. Coughlin,* 804 F.3d 207, 215 (2d Cir.1986). Moreover, any decisions relating to the appropriateness or timing of a specialist consultation are within the purview of the medical staff and any disagreement the inmate has with the decision qualifies as a disagreement over treatment, which is not an actionable Eighth Amendment claim. *Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 312 (S.D.M.Y.2001).

> FN12. Medical records indicate that Dallio had seen eye specialists on July 3 and October 9, 2003. Docket No. 83, Ex. E at 141-42. Additionally, records subsequent to the incident indicate an ophthalmology consult within a month of the incident as well as multiple examinations by medical staff over eye problems and broken glasses, glasses orders, and follow-up appointments and consultations. Therefore, there is no dispute in the record on this motion that Dallio's eyes were being treated in an appropriate manner and defendants' actions neither delayed treatment nor showed deliberate indifference to Dallio's treatment.

Accordingly, defendants' motion as to this claim should be granted as to Perrea and Riley.

**C. Conspiracy**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

Dallio alleges that all defendants conspired to violate his constitutional rights.

### 1. § 1983

In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir.2002); *Cusamano v. Sobek*, 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty*, 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello*, 292 F.3d at 325.

**\*13** In this case, even construing the facts in the light most favorable to Dallio, he has failed to advance anything more than conclusory allegations of a conspiracy. Dallio fails to show specifically when, where, or how defendants came together and planned to assault him. Moreover, Dallio fails to show when or how multiple departments agreed, either expressly or implicitly, to collaborate with one another and independently perpetrate the alleged web of deceit by filing false incident reports, medical records, and investigations. Without anything more than a conclusory allegation that all defendants conspired with one another, Dallio's claims fall short of raising a material question as to whether defendants' actions constituted a conspiracy.[FN13]

> **FN13.** Dallio relies on *Juan v. Rafferty*, 577 F.Supp. 774 (D.N.J.1984), to support the proposition that his assertions that all defendants filed false reports is sufficient to withstand the

current motion. Dallio's reliance is misplaced. In *Juan*, (1) defendants filed a motion to dismiss as opposed to the present motion for summary judgement and (2) the litigation was in its infancy as discovery had not yet been completed. *Id.* at 778. Therefore, the pleadings were sufficient at that early stage to present a basis for a claim. *Id.* The present case is at a far different point. Discovery is now complete and actual evidence rather than allegations of agreements among multiple parties must be advanced. Like *Juan*, Dallio has survived the pleadings stage of the litigation. However, unlike *Juan*, allegations alone at this stage are insufficient as evidence must now be presented for the claim to withstand the current motion. As no evidence was provided, the claim fails to raise a material question of fact.

### 2. § 1985

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus*, 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty*, 490 F.3d 143, 176 (2d Cir.2007). To demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights." *Salgado v. City of N.Y.*, No. 00-CV-3667 (RWS), 2001 WL 290051, at \*8 (S.D.N.Y. Mar. 26, 2001) (citations omitted). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal*, 490 F.3d at 176 (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Here, Dallio does not assert any facts giving rise to a conspiracy. First, Dallio vaguely assert conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). Second, as discussed *supra,* there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Dallio of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion for summary judgment as to Dallio's claims of conspiracy should be granted.

### D. Bouchey and Gettman

Defendant Andrew Bouchey was named in the complaint as a member of the response 20 team. Compl. (Docket No. 1) ¶ 22. However, the undisputed evidence shows that he was not personally involved in the incident. As such, no personal involvement has been shown and Bouchey is entitled to judgment on all claims against him. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ( "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotations and citations omitted).

**\*14** Similarly, defendant C.O. Gettman was identified in the complaint as the individual responsible for taking the photographs subsequent to the incident. Compl. ¶¶ 36-37. All submissions indicate without contradiction that the individual responsible for these photographs was named Clarke. *See generally* Docket No. 78, Ex. D at 7. As such, no evidence of any personal involvement has been shown with regard to Gettman either. Accordingly, he as well should be granted judgment. *Wright,* 21 F.3d at 501.

### E. Qualified Immunity

Defendants claim that even if Dallio's constitutional claims

are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,*80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03-CV-1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if a plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning Dallio's claims other than his Eighth Amendment excessive force and failure to intervene claims because, as discussed *supra,* accepting all of Dallio's evidence as true, he has not shown that any of the defendants in those claims violated his constitutional rights.

As to Dallio's excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9-10. Thus, accepting all of Dallio's allegations about the incident as true, qualified immunity cannot be granted to defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, or Gilmore since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 125774 (N.D.N.Y.)
(Cite as: 2010 WL 125774 (N.D.N.Y.))

**\*15** Accordingly, defendants' motion for summary
judgment on this ground should be (1) granted in the
alternative as to Bouchey, Quinn, Girdich, Gettman,
O'Connell, Perrea, and Riley, and (2) denied as to
Santamore, Comstock, McGuoirk, LaClaire, Buksa,
Ramsdell, Hopkinson, and Gilmore.

END OF DOCUMENT

### III. Conclusion

For the reasons stated above, it is hereby
**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket
No.78) be:

A. **GRANTED** as to defendants Bouchey, Quinn, Girdich,
Gettman, O'Connell, Perrea, and Riley as to all claims
against them, and these defendants should be terminated
from this action; and

B. **DENIED** as to defendants Santamore, Comstock,
McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, and
Gilmore as to Dallio's Eighth Amendment claims of
excessive force and failure to intervene; and

2. The complaint be **DISMISSED** without prejudice as to
defendant Smith pursuant to Fed.R.Civ.P. 4(m) and
N.D.N.Y.L.R. 4.1(b).

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge
written objections to the foregoing report. Such objections
shall be filed with the Clerk of the Court. **FAILURE TO
OBJECT TO THIS REPORT WITHIN TEN DAYS
WILL PRECLUDE APPELLATE REVIEW.**Roldan v.
Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Sec'y of
HHS, 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1);
Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2010.
Dallio v. Santamore
Slip Copy, 2010 WL 125774 (N.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.